<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JAMES HOWARD, | : | |
| | : | |
| Plaintiff, | : | Civil No. 07-5394 (DMC) |
| | : | |
| v. | : | |
| | : | |
| JACK DOES 1-40, et al., | : | **O P I N I O N** |
| | : | |
| Defendants. | : | |

**APPEARANCES:**

> JAMES HOWARD, Plaintiff Pro Se
> Special Treatment Unit
> Avenel, New Jersey 07001

**Cavanaugh**, District Judge

This matter comes before the Court upon submission of an amended complaint ("Amended Complaint") by Plaintiff James Howard ("Howard"). <u>See</u> Docket Entry No. 4. For the reasons stated below, Howard's Amended Complaint will be dismissed without prejudice. Howard will be granted leave to re-amend his Amended Complaint.

### BACKGROUND

#### I.  ORIGINATION OF THE INSTANT ACTION

On September 21, 2007, the Clerk received the complaint ("Original Complaint") docketed as Entry No. 1 in the Civil Action <u>Banda v. Corzine</u>, 07-4508 (WJM) ("<u>Banda</u> Matter"), as well as Entry No. 1 in the instant matter.  The Original Complaint asserted

claims on behalf of numerous plaintiffs ("Plaintiffs"), with Howard being one of them.[1]  See Docket Entry No. 1.  On November 1, 2007, Judge Martini, presiding over the Banda Matter, issued an Order and accompanying Opinion ("November Order and November Opinion") dismissing the Original Complaint and terminating the Banda Matter. See instant matter, Docket Entries Nos. 2 and 3.  Pursuant to Judge Martini's November Order, all Plaintiffs other than Plaintiff Banda were terminated as Plaintiffs in the Banda Matter, and the Clerk opened individual matters for each of these Plaintiffs, Howard being one of them.  See Docket Entry No. 3, at 2.  In addition, pursuant to Judge Martini's November Order, Howard's claims contained in the Original Complaint were dismissed without prejudice, and Howard was granted leave to amend the Original Complaint.  See id. at 3.

On November 23, 2007, Howard executed his Amended Complaint, together with his application for appointment of pro bono counsel, and the Clerk docketed these submissions on November 26, 2007.  See Docket Entry No. 4, 5.  Consequently, this Court directed the Clerk to reopen the instant matter for the purpose of screening Howard's Amended Complaint.  See Docket Entry No. 8.

---

[1]  Plaintiffs were a group of involuntary civilly-committed persons, pursuant to the Sexually Violent Predator Act ("SVPA"), N.J. Stat. Ann. § 30:4-27.24, et seq., and confined at the Special Treatment Unit Annex, Avenel, New Jersey ("Facility"); Plaintiffs "self-certified" themselves into a "class" for the purpose of filing their original complaint.  See Docket Entry No. 1.

## II. HOWARD'S ALLEGATIONS

### A. Allegations Stated in the Original Complaint

This Original Complaint submitted by Plaintiffs alleged that,
on August 30, 2007, Plaintiffs' constitutional rights were violated
by one hundred and eight defendants.[2] See Docket Entry No. 1.  The
allegations set forth in the Original Complaint fell into two
categories: (1) those common to all Plaintiffs; and (2) those based
on the circumstances particular to--and, therefore, presenting
claims unique to--individual Plaintiffs.  See id.  The allegations
common to all Plaintiffs were summarized by Judge Martini as
follows:

> According to Plaintiffs, the chain of August 30th events
> started at 8:25 A.M. with the appearance of an unnamed
> corrections officer, who was "with a 'gun.'" Allegedly,
> five minutes later, at 8:30 A.M., Plaintiffs . . . were
> "ordered to the Dayroom [and] told to line up and face
> the wall, [and] keep eyes forward." Plaintiffs allege
> that, five minutes later, they were "pat-searched and led
> to the Rec[reation] Yard." Seven minutes after they
> entered the recreation yard, Plaintiffs were handed cups
> and served with, approximately, half-a-cup of water per
> person. From this point on, water was re-served to

---

[2]
 The list of original Defendants was as follows: Defendant Jon
Corzine, Governor of the State of New Jersey; Defendant George
Hayman, Commissioner of New Jersey Department of Corrections;
Defendant Bernard Goodwin, Administrator of the Facility; Defendant
Cindy Sweeney, Assistant Superintendent of the Facility; Defendant
Anne Milgram, Attorney General for the State of New Jersey;
Defendant Merrill Main, Clinical Director of the Facility;
Defendant Tina Spanuolo, Supervising Program Specialist at the
Facility; and one hundred John/Jack/Jane/Joan Doe Defendants, who
are corrections officers or public advocates employed by the State
of New Jersey, as well as Defendant John Doe, who is a "Regional
Commander of Department of Corrections." See id., caption.

Plaintiffs on half-an-hour or hourly basis, although
Plaintiffs were finding the supply of water insufficient,
and the water itself insufficiently chilled.  According
to Plaintiffs, at 8:45 A.M., that is, thirteen minutes
after Plaintiffs were removed into the recreation yard,
the Facility officials brought drug-sniffing canines into
the  Facility  and  began  a  search  for  controlled
substances; the search inside the Facility continues for
one hour and twenty-two minutes, and it was followed by
a one hour and thirteen minutes search of the external
parts of the Facility and adjoining trailers.  After the
search was completed, Plaintiffs were ordered to line up
in the recreation yard . . . and, fifteen minutes later,
an unspecified number of [Plaintiffs] . . . was brought
into the Facility for lunch.  About half an hour later,
another group of [Plaintiffs] . . . was brought into the
Facility for lunch.  The remaining [Plaintiffs] . . .
were brought into the Facility to consume lunch in
unspecified sub-groups and time increments, with the last
Detainee being brought into the Facility no later than at
1:25 P.M., that is, about two hours after the entire
lunch service started.  Plaintiffs assert[ed] that
Plaintiffs experienced "intimidation" during their return
to the Facility as a result of a "show of force" which
ensued from the fact that the Facility officers were
"holding . . . 'Riot Guns.'"  Plaintiffs assert[ed] that
[they] were denied (a) access to bathrooms for the period
of five minutes, and (b) access to showers for about ten
minutes.  The . . . "Dayroom" and Mess Hall became . . .
available for regular use by [Plaintiffs] one hour and
twelve minutes after all [they] returned to the Facility.

Banda Matter, Docket Entry No. 2, at 3-6 (citations and footnotes

omitted).

        In  addition,  Judge  Martini's  November  Opinion  summarized

allegations  unique  to  each  Plaintiff.    See  id.  at  6-11.    With

respect to Howard, Judge Martini noted that the Original Complaint

        assert[ed] that, at 12:15 P.M., . . . Howard fell out and
        was declared dead by an unnamed entity but then was
        revived, either by the same or by another unnamed entity.
        Upon . . . Howard's alleged clinical death (and potential
        "revival"), the Facility officials called for an
        ambulance, which took . . . Howard to a hospital at 1:00

P.M. [At a certain unspecified point,] Howard developed
a fever, and . . . a nurse was seen giving C.P.R. to . .
. Howard during the time when . . . Howard was on his way
to the ambulance.   . . .   Howard returned from the
hospital to the Facility on September 7, 2007, that is
eight days after his alleged clinical death.

Id. at 8-9 (citations, quotation marks, brackets and footnotes

omitted).

### B.   **Judge Martini's Treatment of the Original Complaint**

Responding to Plaintiffs' common claims that

the search for controlled substances performed by the
Facility officials was an "unlawful 'prison' search"
impermissible with respect to . . . civilly-committed .
. . Plaintiffs [as well as to Plaintiff's allegations
that] the search . . . amounted to a cruel and unusual
punishment . . . since: (a) "there was [n]o shade in the
[recreation] yard with the exception of a small tent[,]
which could not accommodate" [everyone in the yard]; (b)
[the outside temperature was] 90 to 95 degree[s]"; (c)
re-servings of water to [Plaintiffs] was no more frequent
than every half an hour and the water served was "usually
warm"; and (d) corrections officers "brandished M-16
style guns with individualized mace balls, [and] other
weapons[,] such as batons and night sticks[,] were also
brandished,"

id. at 12, Judge Martini dismissed these allegations for failure to

state a claim upon which relief may be granted.  See id. at 21-36.

Addressing Plaintiff's Fourth Amendment claims, Judge Martini

explained that, pursuant to Hudson v. Palmer, 468 U.S. 517, 530

(1984), and Bell v. Wolfish, 441 U.S. 520, 558-560 (1979), the

search of the Facility was not "illegal," because Plaintiffs'

expectations of privacy yield to the Facility officials' legitimate

governmental interests to ensure that the Facility remains free of

controlled substances.   See Docket Entry No. 2, at 22-23.   With
respect to Plaintiffs' due process claims, Judge Martini subdivided
Plaintiffs' allegations into three groups: (1) those challenging
Plaintiffs' conditions of confinement; (2) those asserting verbal
and "visual" harassment; and (3) those related to Plaintiffs'
medical conditions.   See id. at 23-36.   Judge Martini clarified to
Plaintiffs that acts or verbal (or "visual") harassment cannot, on
their own, serve as a basis to cognizable constitutional
challenges.   See id. at 30-31.

Addressing Plaintiffs' medical claims, Judge Martini first
detailed to Plaintiffs the applicable standard and then addressed
their substantive claims.   See id. at 32 (citing Rhodes v. Chapman,
452 U.S. 337, 346-47 (1981); Estelle v. Gamble, 429 U.S. 97 (1976);
and Rouse v. Plantier, 182 F.3d 192, 197 (3d Cir. 1999)).   While
Judge Martini dismissed the bulk of Plaintiffs' medical claims with
prejudice, see id. at 33-35, he stated, with respect to Howard's
claims, that

> the [Original] Complaint is not clear as to the medical
> needs, and treatment of those needs by the Facility's
> medical personnel (or the hospital personnel), with
> respect to . . . Plaintiffs [like Howard].   While it
> appears that these . . . Plaintiffs were availed to
> immediate attention by the corrections officials when
> these . . . Plaintiffs developed their ailments and/or
> medical conditions, the Complaint fails to specify
> whether . . . Howard . . . obtained any medical treatment
> at the hospital where [he was] taken.

Id. at 35.

Consequently, Judge Martini granted Howard leave to amend the Original Complaint by clarifying Howard's claims. See id. at 62.

Next, with respect to Plaintiffs' conditions of confinement claims, Judge Martini explained to Plaintiffs that the Third Circuit established a two-part test reading as follows:

> we must ask, first, whether any legitimate purposes are served by these conditions, and second, whether these conditions are rationally related to these purposes. In assessing whether the conditions are reasonably related to the assigned purposes, we must further inquire as to whether these conditions cause [inmates] to endure [such] genuine privations and hardship over an extended period of time, that the adverse conditions become excessive in relation to the purpose assigned to them.

Union County Jail Inmates v. Di Buono, 713 F.2d 984, 992 (3d Cir. 1983).

Taking judicial notice of the weather conditions existing in Plaintiffs' locale during the hours at issue,[3] Judge Martini concluded that, being placed in the Facility's recreation yard for three to five hours on a summer morning, when the weather conditions were mild, could not amount to a "hardship over an extended period of time," or to "adverse conditions" excessive in relation to the purpose of keeping Facility detainees outside the Facility during a legitimate search for controlled substances. See id. at 26-27. Consequently, Judge Martini dismissed all

---

[3] The weather conditions were as follows: temperature varied between 72 and 84.5 degrees Fahrenheit, humidity was 61 percent, and western wind varied from 3.5 to 6.9 mph. See Docket Entry No. 2, at 26.

Plaintiffs' conditions of confinement common claims.

Finally, turning to the issue of whether to certify Plaintiff's class, Judge Martini explained that the Original Complaint provided him with no basis for such certification, pursuant to the standard set in Rule 23, see id. at 36-50, and denied certification while observing that a court should be

> mindful of the fact that it is all too easy for one inmate with some purported knowledge of the law to persuade others to join a complaint, whether or not it is in the best interests of the others to do so.

Id. at 38 (citing Swenson v. MacDonald, 2006 U.S. Dist. LEXIS 5784, at *5-6 (D. Mont. Jan. 30, 2006)). Judge Martini, therefore, dismissed the Original Complaint for failure to state a claim upon which relief may be granted and, in addition, enjoined the Clerk from opening any new matters, in which Plaintiff Banda sought to act as a pro se in forma pauperis plaintiff asserting a civil rights violation, without first obtaining leave of the Court. See Docket Entries Nos. 2 and 3.


C.   **Content of Howard's Amended Complaint**

On November 26, 2007, the Clerk docketed Howard's Amended Complaint. See Docket Entry No. 5. The Amended Complaint is a nine-page document naming, as Defendants, "John Doe, Regional Commander of the Department of Corrections Special Operations Group" and Jack Does, 1-40, as well as Joan Doe, 1-40, who are "Department of Corrections Special Operations Group Correctional

Officers."   See id. at 1, caption.   Following the caption, the
Amended Complaint includes: (a) 5 paragraphs of self-typed (rather
then pre-printed) "Instructions," see id. at 1; (b) two pre-printed
pages of instructions titled "Form to Be Used by a Prisoner in
Filing a Civil Rights Complaint," see id. at 2-3; (c) self-typed
list of parties named in the Amended Complaint asserting that the
Defendants in this action "gave unprofessional errors of judgement
and gross negligence in ordering and enforcing the removal of all
[Facility detainees] from the . . . [b]uilding to stay out in [h]ot
[s]un for approx[imately six and a half] hours," see id. at 4-5;
(d) self-typed section titled "Statement of Claims" consisting of
33 paragraphs, see id. at 5-8; and (e) a request for relief in the
amount of $815 million in damages, where $15 million are sought
from Defendant "John Doe, Regional Commander of the Department of
Corrections Special Operations Group," and $10 million are sought
from each Joan and/or Jack Doe, who are "Department of Corrections
Special Operations Group Correctional Officers."   See id. at 9.

    Short of four exceptions detailed below, all parts of the
Amended Complaint are substantively identical to the corresponding
parts of the Original Complaint.   Cf. Docket Entries Nos. 1, 4.
Moreover, short of the same four exceptions, the Amended Complaint
is substantively and literally identical to: (a) an "amended
complaint" submitted by Plaintiff Banda ("Banda's Complaint") and
construed by Judge Martini as Plaintiff Banda's motion for

reconsideration of the November Order, see Banda Matter, 07-4508,

Docket Entries Nos. 6, 7; and (b) other "amended complaints" filed

by Plaintiffs with this District and assigned, inter alia, to this

Court. See e.g., Haines v. Jack Does 1-40, 07-5387 (SRC), Docket

Entry No. 4 ("Haines' Complaint"); Williams v. Jack Does 1-40,

07-5395 (SRC), Docket Entry No. 4 ("Williams' Complaint"). These

four exceptions excluded, Howard's Amended Complaint repeats,

nearly verbatim, the allegations that were addressed by Judge

Martini and dismissed, for failure to state a claim, in Judge

Martini's November Order and November Opinion.

The sole difference between Howard's Amended Complaint and

Banda's Complaint or Haines' Complaint, or Williams' Complaint, is

limited to four entries, namely:

1.   [The] stay out in the [h]ot [s]un . . . caused injury to
     [Howard] in getting [h]eat [s]troke that brough on a
     [h]eart [a]ttack, to which [Howard] "[d]ied" and was
     brough back to life, for this [Howard] to be brough to
     Rahway General Hospital for observation[,] . . . then a
     few days after [he] was brought to St. Francis Hospital
     in Trenton, New Jersey.

Docket Entry No. 5, at 4-6 (repeated verbatim or paraphrased in

similar terms four times, see id. ¶¶ 4(c), 4(d), 11 and 12).

2.   On [August 30th, Howard] woke[]up when [the searching
     officials] came into the . . . Facility, [d]ue to waking
     up late [on that day, Howard] missed [b]reakfast, [Howard
     is a diabetic [and, thus,] for emergency purposes of when
     [Howard oversleeps and] miss[es] [b]reakfast, [h]e has
     some food in storage; [w]hen [the searching officers]
     came in, [t]hey woke [Howard] up and [did] not allow
     [h]im to eat any of [h]is emergency food.

Id. at 7.

3.   At the time [when Howard] pass[ed] out . . . at
     approx[imately] 12:15 P.M. to 12:50 P.M. on [August 30,
     2007, a certain Facility corrections officer] requested
     that the [n]urse [would] take a finger prick, sugar level
     was found to be very low due to not eating, [Howard] was
     close to going into a diabetic com[]a.

Id.

4.   Let it be known that when [Howard] was brought back to
     life on [August 30, 2007], that [h]e had to be "shocked"
     back to life.

Id.

     Short of the four entries detailed above, the Amended

Complaint repeats the allegations made in the Original Complaint

and dismissed by Judge Martini for failure to state a claim upon

which relief may be granted.   Judge Martini's ruling will not be

disturbed by this Court: Howard cannot get a "second bite on the

apple" by merely reiterating the dismissed claims.[4]

---

[4]
     The doctrine of res judicata applies when "the same
     issue was previously litigated by the same parties and
     was actually decided by a tribunal of competent
     jurisdiction." Duvall v. Attorney General of the
     United States, 436 F.3d 382, 391 (3d Cir. 2006).   Three
     requirements must be met.   There must be "(1) a final
     judgment on the merits in a prior suit involving; (2)
     the same parties or their privities; and (3) a
     subsequent suit on the same cause of action."
     CoreStates Bank, N.A. v. Huls America, Inc., 176 F.3d
     187, 194 (3d Cir. 1999) (internal quotation marks and
     citation omitted). Res judicata applies both to claims
     actually raised in the prior action and claims which
     could have been raised but were not.   Id.   We take a
     broad view of the "same cause of action" requirement,
     looking to "whether there is an essential similarity of
     the underlying events giving rise to the various legal
     claims." Id. ( citing United States v. Athlone Indus.,
     746 F.2d 977, 984 (3d Cir. 1984)).

Therefore, this Court's analysis will be limited to the allegations made in the four entries detailed in the preceding Section of this Opinion.

## STANDARD OF REVIEW: RULE 8 PLEADING REQUIREMENT

In determining the sufficiency of a complaint, the Court must be mindful to construe the facts stated in the complaint liberally in favor of the plaintiff. See Haines v. Kerner, 404 U.S. 519 (1972); United States v. Day, 969 F.2d 39, 42 (3d Cir. 1992). The Court should "accept as true all of the [factual] allegations in the complaint and reasonable inferences that can be drawn therefrom, and view them in the light most favorable to the plaintiff." Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997). While a court will accept well-pled allegations as true, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. See id.

The Court of Appeals for the Third Circuit recently provided a detailed and highly instructive guidance as to what kind of allegations qualify as pleadings sufficient to puss muster under the Rule 8 standard. See Phillips v. County of Allegheny, 515 F.3d 224, 230-34 (3d Cir. 2008). The Court of Appeals explained:

---

Gonzalez Cifuentes v. INS, 253 Fed. App. 173, 175 (3d Cir. N.J. 2007).

[There are] two new concepts in Twombly. First, . . . [t]he [Twombly] Court explained that "[w]hile a complaint . . . does not need detailed factual allegations, a plaintiff's [Rule 8] obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 127 S. Ct. at 1964-65 . . . . The Court explained that Rule 8 "requires a 'showing,' rather than a blanket assertion, of entitlement to relief." Id. at 1965 n.3. Later, the Court referred to "the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'" Id. at 1966. The Court further explained that a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 1965 & n.3. Second, the Supreme Court disavowed certain language that it had used many times before -- the "no set of facts" language from Conley. See id. at 1968. . . . As the Court instructed, "[t]his phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." Twombly, 127 S. Ct. at 1969.

[T]he Twombly decision focuses our attention on the "context" of the required short, plain statement. Context matters in notice pleading. . . . [Thus,] taking Twombly and the Court's contemporaneous opinion in Erickson v. Pardus, 127 S. Ct. 2197 (2007), together, we understand the Court to instruct that a situation may arise where, at some point, the factual detail in a complaint is so undeveloped that it does not provide a defendant the type of notice of claim which is contemplated by Rule 8. See Airborne Beepers & Video, Inc., v. AT&T Mobility L.L.C., 499 F.3d 663, 667 (7th Cir. 2007). Put another way, in light of Twombly, Rule 8(a)(2) requires a "showing" rather than a blanket assertion of an entitlement to relief. [Hence,] without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only "fair notice," but also the "grounds" on which the claim rests. See Twombly, 127 S. Ct. at 1965 n.3.

The second important concept . . . is the rejection of Conley's "no set of facts" language [which became] problematic because, for example, it could be viewed as requiring judges to speculate about undisclosed facts. . . . After Twombly, it is no longer sufficient to allege

mere elements of a cause of action; instead "a complaint must allege facts suggestive of the proscribed conduct." Id. . . . The Court [however,] emphasized . . . that it was neither demanding a heightened pleading of specifics nor imposing a probability requirement. See id. at 1964, 1965, 1973 n.14, 1974; [accord] Erickson, 127 S. Ct. at 2200.

The more difficult question raised by Twombly is whether the Supreme Court imposed a new "plausibility" requirement at the pleading stage that materially alters the notice pleading regime. . . . The Court explained that a plaintiff must "nudge [his or her] claims across the line from conceivable to plausible" . . . . 127 S. Ct. at 1974. . . . "Plausibility" is related to the requirement of a Rule 8 "showing." [Thus, while the court cannot] dismiss[] . . . a well-pleaded complaint simply because "it strikes a savvy judge that actual proof of those facts is improbable," the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 1965. [T]he pleading standard can be summed up thus: "stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest" the required element. Id. This "does not impose a probability requirement at the pleading stage[]" but . . . "calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of" the necessary element. Id.

Phillips, 515 F.3d at 230-34 (original brackets removed).


## DISCUSSION

### I.   FOURTEENTH AMENDMENT DUE PROCESS CLAIM

As Judge Martini already explained to Plaintiffs, Howard included, analysis of whether a civil detainee has been deprived of liberty without due process is governed by the standards set out by the Supreme Court in Bell v. Wolfish, 441 U.S. 520 (1979). Fuentes, 206 F.3d at 341-42.

A court must decide whether the disability is imposed for the purpose of punishment or whether it is but an

incident of some other legitimate governmental purpose.
Absent a showing of an expressed intent to punish on the
part of detention facility officials, that determination
generally will turn on "whether an alternative purpose to
which [the restriction] may rationally be connected is
assignable for it, and whether it appears excessive in
relation to the alternative purpose assigned [to it]."
Thus, if a particular condition or restriction of [civil]
detention is reasonably related to a legitimate
governmental objective, it does not, without more, amount
to "punishment."    Conversely, if a restriction or
condition is not reasonably related to a legitimate goal-
-if it is arbitrary or purposeless--a court permissibly
may infer that the purpose of the governmental action is
punishment that may not constitutionally be inflicted
upon detainees qua detainees.

441 U.S. at 535-39 (citations omitted).

The government has legitimate interests that stem from its

need to maintain security and order at the detention facility.

"Restraints that are reasonably related to the institution's

interest in maintaining jail security do not, without more,

constitute unconstitutional punishment, even if they are

discomforting and are restrictions that the detainee would not have

experienced had he been released while awaiting trial." Bell, 441

U.S. at 540.    Retribution and deterrence, however, are not

legitimate non-punitive governmental objectives.    See id. at 539

n.20.   Nor are grossly exaggerated responses to genuine security

considerations.  See id. at 539, 561-62 and n.20.

Since a sweeping search of the facility for presence of

controlled substances is certainly a legitimate governmental

purpose, a removal of civilly-committed detainees in the facility

recreation yard for the purposes of conducting such search does not

violate the detainees' due process, especially if the detainees are placed in the yard only for a few hours, served certain amount of water, allowed to consume their lunch in a timely fashion, and the entire event takes place during a summer morning when the temperature fluctuates between 74 and 82.5 degrees Fahrenheit. See Banda Matter, 07-4508, Docket Entry No. 3 (where Judge Martini provided exhaustive discussion of Plaintiffs' due process claims). In contrast, if defendants prevent a plaintiff-detainee from taking his medicine (or medicine-like substance) while being aware of the fact that the plaintiff's health could be at risk, such risk might be found excessive in relation to the purpose of conducting a search of the facility and, thus, the defendants' actions could be deemed "punishment" within the meaning of the Fourteenth Amendment.

## II.  A DUE PROCESS CLAIM BASED ON A MEDICAL CONDITION

### A.  Factual Considerations

This Court's discussion of Howard's amended complaint is not feasible without at least a cursory discussion of the medical condition alleged by Howard: diabetes.

Diabetes is a disease marked by high levels of sugar in the blood.  Diabetes can be caused by too little insulin (a hormone produced by the pancreas to control blood sugar), resistance to insulin, or both.  If the process of food metabolism is normal, two main things happen when food is digested: (1) a sugar called

glucose (a source of fuel for the body) enters the bloodstream; and
(2) the organ called the pancreas produces insulin to move glucose
from the bloodstream into muscle, fat, and liver cells, where it
can be used as fuel.  There are three major types of diabetes: (1)
Type I diabetes (usually diagnosed in childhood), when the body
makes little or no insulin and, thus, daily injections of insulin
are needed to sustain life; (2) Type II diabetes (a far more common
version) usually occurs in adulthood, when the pancreas does not
make enough insulin to keep blood glucose levels normal, often
because the body does not respond well to the insulin; and (3) the
so-called "gestational" diabetes, which occurs during pregnancy.
Usually,

> diabetics use insulin to lower their blood sugar levels
> ([since] the long term effects of chronically elevated
> blood sugar include heart disease, kidney disease, nerve
> disease and blindness).  However, excessive use of
> insulin may cause too much sugar to leave the
> bloodstream, leading to abnormally low blood sugar levels
> (hypoglycemia).  A person with mild to moderate
> hypoglycemia may experience symptoms including tremors,
> sweating, irritability, confusion and drowsiness. Eating
> simple carbohydrates will raise the blood sugar level in
> an individual with mild to moderate hypoglycemia. Severe
> hypoglycemia may lead to unconsciousness and convulsions
> and can be life-threatening.

Branham v. Snow, 392 F.3d 896, 899 (7th Cir. 2004).

While hypoglycemia is most common in people who take too much
insulin, it also occurs if a diabetic skip meals or snacks, or
exercises too vigorously, or drinks too much alcohol.  See <<http:
//www.mayoclinic.com/health/diabetic-coma/DS00656/DSECTION=3>>.

How quickly the diabetic's blood sugar drops influences the symptoms of hypoglycemia; while the symptoms may be minimal if the blood sugar to drops a small amount over a few hours, the same drop experienced within a few minutes causes the symptoms to be more pronounced. See id. It also appears that diabetics are more susceptible to heat stress and may suffer significant implications, such as heat stroke, especially if the hot environment is coupled with dehydration. See, e.g., <<http://jrnlappliedresearch.com/art icles/Vol3Iss1/PETROFSKY.htm>>; <<http://www.newswise.com/articles/ view/522480/>>.

Here, Howard's amended complaint appears to suggest that, on August 30, 2007: (1) he experienced a case of hypoglycemia, allegedly because Howard overslept, missed eating breakfast, was not allowed to eat his stashed food in lieu of breakfast, and had the amount of glucose in his body insufficient to carry him through till lunch; and (2) his diabetic condition was worsened by warm outside temperature and his ability to obtain only limited servings or room-temperature water. See Docket Entry No. 5, at 7.

## 2.   The Shortcomings of the Amended Complaint

As drafted, Howard's Amended Complaint fails to state a cognizable claim, since nothing in his allegations indicates that Defendants sought to inflict unnecessary and wanton pain on Howard when Defendants removed all the Facility detainees into the

Facility recreation yard in order to conduct a Facility-wide search for controlled substances. Moreover, it was wholly reasonable for Defendants to prevent Howard from consuming his personal "stash," since Defendants' mandate was to check the Facility for controlled substances and that, by definition, implied preclusion on consumption of any substance storaged within the Facility. Finally, it would be indeed ludicrous to expect officers searching for controlled substances to inquire with inmates as to whether the inmates did eat the breakfast meal served at the Facility, or had any reason not to miss that meal, or whether the inmate went back to sleep after consuming the breakfast meal or their personal "stashed" food in lieu of breakfast. Rather, it appears apparent that Defendants were pursuing a legitimate goal reasonably related to the Facility's governmental penological interests.

Paramountly here, nothing in Howard's allegations indicates that: (1) Howard informed Defendants (or the Facility officials) of his diabetic condition (and the fact that his need to consume food ensued from that health-related reason); and (2) Defendants (or the Facility officials) ignored the potential harm to his health by refusing to Howard's request to provide him with a snack from the Facility's food stock.[5]

_____

[5]
Strikingly enough, Howard's Amended Complaint does not indicate that, upon blood test indicating that he was having a case of hypoglycemia, Howard either requested or was provided with any food by the Facility officials. See generally, Docket Entry No. 5. To top it off, Howard's Complaint expressly states that he has no

The language used by Howard merely suggests that Howard himself was aware of the risk to his health.   Since the Amended Complaint does not indicate that Defendants were notified of that risk while they were pursuing legitimate penological goals, Defendants could not have acted with "intent to inflict unnecessary and wanton pain" and, therefore, Howard's Amended Complaint fails to state a claim upon which relief may be granted.   However, this Court shares concerns expressed by Judge Chesler in his assessment of analogously deficient amended complaints filed in this District by plaintiffs Williams and Haines.   See Haines v. Does, 07-5387 (SRC); Williams v. Does, 07-5395 (SRC).   Judge Chesler observed that:

> the actual language used in [these] Amended Complaint[s] appears to be an unreliable source of information in view of excessive and suspicious similarities between the language used in [these] Amended Complaint[s] and that in the Original Complaint, as well as in Banda's Complaint . . . .   Taking note of Judge Martini's observation that "the court should be mindful of the fact that it is all too easy for one inmate with some purported knowledge of the law to persuade others to join a complaint," Banda Matter, 07-4508, at 38, this Court expresses its grave concern about the possibility that [the] instant litigation is being hijacked by one of the original Plaintiffs (who might or might not be Plaintiff Banda enjoined, by Judge Martini, from future meritless pro se in forma pauperis filings with this District).   Therefore, this Court is reluctant to find . . . that [these plaintiffs] cannot state a cognizable claim.

_____
claims no claims against the Facility correctional officers and/or any medical staff, even though the Facility's medical staff conducted the blood test, determined that his blood sugar lever was dangerously low and yet failed to give him any food.   See id. at 4-6.

Haines v. Does, 07-5387, Docket Entry No. 8, at 19; Williams v. Does, 07-5395, Docket Entry No. 7, at 15-16.

This Court agrees.  Consequently, the Court will dismiss Howard's Amended Complaint without prejudice and grant Howard, one more time, leave to "re-amend" his Amended Complaint by detailing the facts related to denial of food to Howard either prior to his removal to the recreation yard, or during the period of time (equal to three hours and 45 minutes) when Howard remained in the yard. Specifically, this Court wishes to obtain information as to whether Howard (or any other entity) related the fact of Howard's diabetic condition (and the ensuing needs for food consumption and avoidance of bodily overheating) to Defendants at the time when Howard asked them for permission to consume a snack prior to being removed to the yard, or if Howard (or any other entity) made an analogous explanation and requests to Defendants at any time while Howard remained in the yard.[6]

---

[6]

At this stage, Howard does not need to limit himself to first hand information or to conduct any discovery.  However, his "re-amended" complaint shall state *facts* known to Howard directly or indirectly, rather than mere bold conclusions.  For instance, a statement that "Defendants knew of Howard's diabetic conditions because they should have known, or somebody must have told them, or because Howard so divines" would be insufficient: Howard shall state at least some *facts* that led him to believe so.  See Phillips, 515 F.3d at 230-34.  Moreover, same as Judge Chesler in his handling of Williams and Haines matters, this Court stresses the fact that (while Howard may, if he so wishes, seek help from and/or consult with a licenced attorneys or discuss his case with unlicensed "jailhouse lawyers," or any of his acquaintances at the Facility and/or outside it, for the purposes of this litigation,

**CONCLUSION**

For the foregoing reasons, Howard's Amended Complaint will be dismissed without prejudice.  The Court will grant Howard leave to "re-amend" his Amended Complaint.

Howard's application for appointment of <u>pro bono</u> counsel is denied without prejudice, as premature.

An appropriate Order accompanies this Opinion.

Dennis M. Cavanaugh
United States District Judge

Dated: 4/23/08

---

including for the particular purposes of Howard's submission of his "re-amended" complaint) it is Howard--and Howard alone--who is the master of his claims and the sole plaintiff in this action.  In other words, this Court wishes to hear from Howard himself (rather than from the entity that hold Howard's hand or dictates Howard his statements), and it will be Howard--rather than some other person-- who is affected by the future submissions made in this matter.